Kenneth REINER and Frank A. Klaus, Jr., doing business as The Kaynar Company, and Kaynar Mfg. Co., Inc., Plaintiffs,

v.

The I. LEON CO., Inc., Defendant.

Civ. A. No. 13308.

United States District Court
E. D. New York.

June 20, 1958.

Brumbaugh, Free, Graves & Donohue, for plaintiffs, by Walter H. Free and John F. Neary, Jr., New York City, of counsel.

Charles A. Morton, Baldwin, N. Y., for defendant.

BYERS, Chief Judge.

This patent cause has to do with Reiner Reissue Patent of November 1,

1949 No. 23,163 whereby the original patent of January 18, 1949 was in effect amended.

For simplicity, the plaintiffs will be referred to in the singular as Reiner.

The device involved is a clip for holding in shape a curl of human hair once it has been formed, until the clip is removed.

The usual issues are presented of validity and infringement. The accused structure is in close resemblance to that of the plaintiff, and whether there is any essential difference requires a close study of the art, and some sense of discrimination in analyzing the asserted differences of construction.

Essentially there is nothing new about a holding device composed of two engaged elements, and capable of being separated so as to release the object so held. The words "clasps" and "clips" have been most frequently employed to designate these contrivances.

There are three requisites:

a) The parts that do the holding.

b) The connection that constitutes them a single operating unit, namely that which performs the office of a hinge to hold them in operable engagement. For convenience, and without other sanction, that element will herein be referred to as the hinge.

c) A member that enables the holding parts to open and close as required.

The first will be self-explanatory and of obvious significance.

The second constitutes a means whereby the two holding parts or arms can be so held together that the movement of one reacts against the other to accomplish the clasping purpose.

In such devices as paper or textile holding clips or clasps as described in the Turnor, Porter and Cahn patents, later to be mentioned, the ends of the holding elements do the gripping or holding; that is, the ends farthest from the hinge.

In hair clips and curlers, such as Fuscaldo and Bergen, the engagement of the holding arms extends from their outer ends almost to the hinge, so that there is no idle area so bounded.

Since the requirements for holding differ by reason of the nature of the respective tasks to be performed, the constituency of the hinge assumes a certain importance when human hair is to be held in the form of a curl, which is not required in Turnor, et al.

This means that the hinge element must be so contrived as not to interfere with comfortable use, therefore the hinge construction has its place in a consideration of this assembly.

In Cahn and Turnor (neither being a hair clip) the hinge element consists in side lugs, ears, spurs, etc. integral with the arms, and which variously co-act for the purpose of holding the arms in constant engagement. A like construction is shown in Fuscaldo, a hair clip.

It thus becomes necessary to consider the hinge construction taught by the plaintiff's patent and also shown in the challenged device. In simple language, the upper and lower arms are held together by the bending upward of the upper arm at an obtuse angle which at its apex is attached to the lower arm.

The angle is formed so as to rest upon the lower plate; thus the upper arm becomes a lever, and the apex of the angle constitutes a fulcrum upon which the lever moves against the lower arm at a point about nine-tenths its length measured from the clamping ends of the two arms.

The fastening of these latter is thus described in the plaintiff's brief (p. 3):

"The preferred embodiment disclosed in the patent has an upper plate 1 and a lower plate 2 which overlie each other* (col. 2, 1.3). The upper plate 1 has pierced holes or 'sockets' 11, formed in its plane

---

* i. e., specifications.

and the lower plate 2 has upwardly extending projections or 'spurs' 10, struck up from its material, which extend upwardly through the sockets 11 in the upper plate 1 and prevent the two plates 1 and 2 from shifting relatively to each other (col. 2, 11.-21–35).

"One end of the upper plate 1 is bent away from the lower plate 2 at the point where the spurs 10 project into the sockets 11, so as to form an obtuse angle in the upper plate, called the 'dihedral angle 12' * (col. 2, 1.39). This angle also forms with the lower plate 2 an acute angle called the 'clearance angle' * (col. 2, 1.46) so that when the two adjacent ends or handle portions of the plates 1 and 2 are squeezed together, they 'rock' upon one another about the spurs and sockets 10 and 11* (col. 2, 11.35–50)."

The hinge thus operates to hold the plates in constant and immovable relation, and the rocking motion above referred to permits the arms to open and close.

While this result is accomplished according to the structures shown in the prior patents above referred to, through use of ears, dogs, pivots, etc., those forms of construction are not adaptable to the special office of the clips here involved.

The concept of rocking one arm upon the other, the top member being bent to form an angle, the apex of which rocks upon the lower, was not first exemplified in the plaintiff's patent.

It is clearly shown in Leon Design Patent 138,901, filed August 1, 1944, granted September 26, 1944, and in Leon 2,467,487, filed April 6, 1944, granted April 19, 1949. Of the structure so disclosed in the Design Patent, the plaintiff had actual knowledge when his original application was filed on January 18, 1949.

However there is no teaching even in Leon 2,467,487 of a permanent interlocking of the two arms, at the fulcrum. Indeed the third element (a rubber band or casing which surrounded the area of engagement of the arms) was said to serve (Claim 1) "as a resilient recoil, and also permitting a yieldingly side movement of said sections (i. e., the arms) when said sections are pried apart by the fingers holding said hair clip * * *."

Such a side movement is impossible in the Reiner structure and also in the accused device.

It now becomes necessary to consider the third requisite above stated c), and this exposes the sensitive nerve of the controversy.

It is not enough that an opening or closing be possible, through the medium of what has been called the hinge. That action must be within the control of the user, so that the clip may be opened at will, or in effect locked in the closed position.

Thus the third element is a spring. For patent purposes it is termed "resilient means" but we are dealing with a sufficiently concrete problem to justify calling it by its right name.

The spring in these devices is formed by using a strip which is part of one arm; the strip is formed by cutting its two sides and end from the body of one arm, leaving one end as an integral part of the arm itself. The portion so excised is bent into a bow, and in that form becomes a spring by virtue of the inherent qualities of the metal from which it is cut; seemingly the energy used in forming the bow is retained, and permits it to function as a spring.

Thus the third requisite is provided, with the same result for present purposes as though the spring itself were a separate element assembled with the arms, to produce a clip.

The expression "two piece clip" which is used to describe these devices is justified, but should be understood to comprehend in effect, the third or spring element.

The use of one arm to produce the spring is not new. It was shown in Turnor, British Patent 10,972 (1892) to which reference has been made; also

Porter 206,896 (1878); Cahn 769,336 (1904); Halket 1,387,978 (1921) and others. Thus is was not new to provide a spring created from an arm, to control the operation of a clip or clasp.

The Leon patents which disclose the rubber casing are not helpful in this connection. While the effect thereof in enabling the user to open and close the holding members is like that of a spring, rubber is not as durable as metal, and the lateral play which such a band encourages in the manipulation of the arms, is foreign to the purpose accomplished by the spring in these competing devices.

An understanding of the plaintiff's spring will be promoted by viewing the device in side elevation, the engagement ends of the arms being thought of as the front of the device. It will be seen that the spring emerges from its parent upper arm when the latter has been bent upward so as to form the obtuse angle. The spring results from forming a bow which extends forward and down around the hinge between the upper and lower arms. The bow enters and passes through an opening in the part of the upper arm immediately forward of the hinge engagement, and down to an opening in the lower arm, and through that opening to the lower side of the lower arm, where the spring itself is bent, so that it hooks onto the rear end of that opening and thus is anchored. The hook acts to hold the latter into snug engagement with the upper arm. However, this is not the sole means to that end, for the spurs and sockets of the hinge element play their own part in that result.

It will be seen that at the apex of the obtuse angle, two spurs rise from the lower arm, one on each side of the opening in the upper arm resulting from the excising of the strip therefrom; those spurs penetrate openings or sockets provided to receive them and thus as above stated lateral movement between the two arms is prevented.

The rear ends so to speak of the two arms are thus spread apart vertically in angular relation. This is called the clearance angle, in distinction to the obtuse angle above referred to. The ends form handles for the manipulation of the clip. When these are squeezed together, the pressure overcomes the locking action of the spring sufficiently to cause the front ends of the arms to separate for the insertion of a curl into, or its removal from, the clip.

It will be seen that this pressure manifests itself solely on the upper arm which moves away from the lower; this means that the spring which is part of the upper arm is really stretched as the handle part of its parent is moved downward. When that pressure is released, the resiliency of the spring causes the bow to resume its normal position.

It should be said that the foregoing is thought to portray what takes place in the preferred embodiment of the patentable disclosure.

There is much discussion in the briefs concerning the hook end of the spring above stated. It is clearly present in the plaintiff's clips (Exhibits No. 6 and 13).

However, none of the claims in suit (1, 2, 3, 4, 7, 10 and 11) so states. Claim 1 in this connection may be quoted:

> "One of said plates having a resilient integral extension struck from its material and projecting toward the clamping jaws, engaging the other plate and constantly urging the jaws toward their closed position."

Obviously every hook is an engagement, but not every engagement is a hook.

One matter in dispute then is whether an engagement which is not a hook, is within the patentable disclosure.

The question seems to turn on whether it is patentable invention to teach a spring that exerts downward pressure instead of the reverse, in such a clamp or clip as these, having in mind all that the art knew of such contrivances.

If the foregoing is a reasonably accurate description of the plaintiff's device, it becomes necessary to discuss briefly what was known on January 18,

1949 when the plaintiff's original patent was filed.

The art knew:

1) Hair clips composed of two arms held together, which could be opened and closed at a junction point of the arms, for insertion into and removal from, curls formed on the human head:

*Fuscaldo* #2,149,214, granted Feb. 28, 1939;

*Bergen* #2,415,331, granted Feb. 4, 1947;

*Leon* (Design Pat.) #138,901, granted Sept. 26, 1944.

In only the first two was opening and closing caused by metallic spring action.

2) Clips for articles other than curls, composed of two arms held together but which could be opened and closed at a junction point of the arms, by spring action:

*Porter* #206,896, granted Aug. 13, 1878;

*Cahn* #769,336, granted Sept. 6, 1904;

*Halket* #1,387,978, granted Aug. 16, 1921;

*Atchley* #1,591,732, granted July 6, 1926;

*Turnor* (British) #10,972, granted Mar. 12, 1892.

As to all of these and Bergen, supra, the spring was formed from one of the arms and continued partially integral with it, instead of being wholly detached. Thus a spring was formed as completely as though a separate element had been introduced into the assembly.

It was not new therefore for Reiner so to form his spring, as explained heretofore.

3) That the arms of such a clip could be held in fixed engagement by the interaction of certain of their integral parts provided for the purpose:

*Turnor*—bearing ears and bearing holes.

*Cahn*—lugs and ears.

*Halket*—trunnions and ears; actually tabs and ears.

*Fuscaldo*—ears held by a pivot pin.

It follows that the concept of spurs and sockets to receive them, being integral parts of the arms, differed from what had been known and presumably practiced only in such mechanical details as form and configuration.

4) That the rocking motion of one arm of a hair clip bent so as to form an obtuse angle, when moved against the other arm at about the apex of the angle, would open and close the arms at will if they were held in resilient engagement.

So much is clearly shown in the drawing of Leon Design Patent #138,901 (September 26, 1944) and particularly in Fig. 2 of D'Alberto Design Patent #148,461 (January 27, 1948).

The foregoing summary is thought to indicate that what was left for patentable invention in the art of making hair clips at the plaintiff's filing date, was straitly circumscribed. This court has had difficulty from the early days of the trial in evoking a convincing statement of the patentable disclosure, namely the possibilities of such invention in the art of making such hair clips—that which had not been anticipated by those predecessors of the plaintiff in this humanly appealing—but of less than seismic significance—field of mundane affairs.

### Validity.

██ In coming to grips with this question, the threshold admonition is to be accepted that the patent is presumed to be valid and that the burden of establishing the contrary is on the defendant (Title 35 U.S.C. Sec. 282).

It has been recently said in a quotation that,

" '* * * the proof must be more than a dubious preponderance —it must be strong, clear and convincing.' " Wyott Mfg. Co. v. Doran Coffee Roasting Co., D.C., 160 F. Supp. 644, 647.

The plaintiff's expert, Stam, defined the patentable invention in these words:

"In its broadest sense, I consider the patentable invention disclosed by Reiner to reside in the provision in a two-piece pin curl clip of a spring arrangement wherein a spring element integral with one of the members is arranged to pass around a rocking axis and through to the opposite side of the other member to engage in said other member * * * whereby * * the spring is effective to normally bias the clamping jaws to a closed position, and is also effective to exert a pressure at the pivot point, tending to hold the clips in assembled relation."

To repeat, the claims in suit are 1, 2, 3, 4, 7, 10 and 11.

The specifications need not be quoted except in connection with arguments directed to certain parts thereof. It will be convenient to insert Claim 10, which is as follows:

"10. In a clamp of the kind described, for clamping a flat curl on one's head, the combination of two plate-form members having clamping jaws and handle portions diverging from each other, said members having correlated means integral respectively with said members, said means engaging each other and enabling the said members to rock upon each other upon an axis toward an open position when said handle portions are pressed toward each other, the handle portion of the member that lies remote from the head forming an angle with the plane of the other member substantially at the location of said axis, one of said members having a resilient integral extension struck from its material disposed in a bow extending across the said angle and having its connection to that member located adjacent the handle portion thereof, said bow located adjacent said axis, and the end portion of said resilient extension engaging the other of said members and operating to constantly urge the jaws toward their closed position."

Other claims will be referred to as may be necessary in connection with the defendant's arguments addressed thereto.

The defendant argues strenuously that all of the claims in suit should be construed to limit the spring to one which at its free end is equipped with a hook to engage the opening in the lower side of the lower arm, which has been referred to heretofore.

The specification (Col. 3, lines 11–14) reads:

" * * * and we provide the end of this tongue with an inwardly bent hook 17 which is hooked over the edge 18 that is formed at the inner end of the slot 9 of the member 2."

And again (Col. 3, lines 37–40):

"As this movement (the swinging of the jaw end of the top plate against the jaw end of the bottom plate) is completed, the hook 17 will snap under or 'over' the transverse edge 18, which interlocks the two plates to each other."

It should be added that lines 44 to 46 in the same column read:

"Many other embodiments of the invention may be resorted to without departing from the spirit of the invention."

It is true that none of the claims in suit provides that the end of the spring shall be in the form of a hook to engage the transverse edge of the aperture 18.

In every one of the claims in suit the spring is described as "engaging the other member and urging the jaws toward their closed position * * *."

In two of the plaintiff's commercial structures the spring does not possess a hook but presses down upon the lower plate (Plaintiff's Exhibits 21 and 22) and such a spring is clearly consistent with the above quoted provisions of the claims.

The defendant asserts that the court has already construed the hook to be an

essential element of the invention as described by the patentee, and his citation to the record should be quoted:

"The hooking end is perfectly obvious to me. Now perhaps I am the only one in the world who can see it, but I can see it, and, read with the specification of the patent, it is quite clear that it is an essential nature of the invention as conceived by the patentee."

And again:

"I suppose that if I had to rephrase it I would say that, as to the patentable disclosure it would seem to me that the hooking of that spring is a necessary part."

The foregoing observations were made at a stage of the trial at which only plaintiff's exhibit 6 (containing the hook) was under examination; they were informal and of course subject to change in the light of whatever further testimony the case might disclose.

To the extent that it may be thought to suggest a construction of the disclosure, it was tentative and subject to correction.

Since the patentee did not embrace this element of his preferred construction in the language of his claims, the latter will not now be construed as though the hook portion of the spring should be deemed to constitute an element of any claim in suit.

This is a finding.

Since the defendant's device embodies a spring which presses down on the upper aspect of the upper arm but which has no hook, and which spring is an integral part of the lower arm; and since such a construction is thought to be shown in the Schildt patents #2,687,737 and #2,638,908, both of which were applied for and issued subsequent to the grant of the patent in suit, it should be made clear that the decision in this case is not intended to suggest anything which could be availed of, in the event that future litigation may arise between these parties in which the question of possible anticipation of the Schildt construction by Reiner might be suggested. This remark is made because the defendant is understood to be the owner of the Schildt patents.

Other criticisms of the claims advanced by the defendant are:

a) *Handles.*

If understood, the argument runs that the reference to handles was contained in original Claim 5, but not in Claims 1 and 3; that Reissue Claims 1 and 3 now include handles as part of the structure. This being so, it is argued that Reissue Claims 1 and 3 were thereby actually broadened. It is true that the words "having integral handles" were inserted before the words "and clamping jaws" in Reissue Claims 1 and 3. It is also true that original Claim 5 included the words "and having operating handles at their other ends."

In this connection, Column 2, lines 42 et seq. of the original specification should be quoted:

"Furthermore, the openings or sockets 11 are preferably located at a dihedral angle 12 which is produced by bending the adjacent end portion of the clamping member 1 away from the lower member 2 so as to form a handle, or handle extension 13. The other member 2 is also provided with a handle extension 14 * * *."

The reissue specification, Column 2, lines 37 et seq., is precisely the same.

Since the handles were specified and originally claimed as has been stated, it is thought that the argument that Reissue Claims 1 and 3 have been broadened is tenuous and so lacking in substance that it cannot be acceded to. This is particularly so because if these Claims 1 and 3 were thought to be vulnerable for the reasons advanced by the defendant, the plaintiff's patent as a whole would not be thereby discredited.

It is purely a matter of construction at best and when the specifications, both original and reissue, are assimilated with Claims 1 and 3 for the purposes of construction, having in mind the nature of

the disclosure as a whole, the finding is hereby made that Reissue Claims 1 and 3 do not define a combination of more elements than original Claims 1 and 3, and they are not for a different invention.

b) *Direction of the spring.*

The defendant calls attention to the failure of Reissue Claim 4 to state that the spring element curves forwardly. It is true that the expression which occurs in Claim 1, namely (in referring to the spring): "and projecting toward the clamping jaws" is not repeated in Claim 4; it is also true that in Claim 2 the spring is described as "projecting toward the clamping jaws" and in Claim 3 that the spring extends "around the axis of said rocking connection" (which incidentally indicates the bow form of the spring) and an equivalent statement appears in Claims 7 and 10.

█ Granting that the objection is technically sound, it is not clear why it is urged; while each claim should stand or fall on its own language, it is not thought that needless repetition of a given expression is always required where the sense of the claim as a whole is consistent with the evident purpose of the patent. Even if it be conceded that Reissue Claim 4 is deficient in this respect it does not follow that the defendant thereby gains any advantage in the long run.

The same argument is urged with reference to Claims 3, 7 and 11; but 3 and 7 describe the spring as extending around the axis; the direction of the spring is clearly indicated, having in mind the recital of the specification and Fig. 2 of the drawing to which reference has been made. As to Claim 11, the language is "and the end portion of said resilient extension engaging the other of said members and operating to constantly urge the jaws toward their closed position," which unmistakably means that the direction of the spring is forward.

c) *The bow spring.*

In his reissue application, the patentee differentiated the bow springs as shown in earlier patents by the statement that he disclosed "the extension in a bow extending around the axis of the rocking connection." The defendant argues that Reissue Claims 1, 2 and 4 are invalid because they omit the word "bow" in describing his spring. As to Reissue Claim 1, it is true that the quoted word is not used. However the claim clearly states that the spring is struck from one of said plates and projects toward the clamping jaws and engages the other plate; that result could not be accomplished unless the spring were curved as illustrated in Fig. 2 of the application.

As to Claim 2, the language is generally the same as in Claim 1.

The specification (Col. 3, lines 7 et seq.) states:

"In the present instance, we bend up a tongue 16 that is struck out of the material of the upper plate 1 to form its slot 8, that is to say, we bend this tongue around into bow form preferably as indicated in Fig. 2."

As to Claim 4 it is true that the bow form and the direction of operation in the spring are not specified, and it follows as a matter of construction that Reissue Claim 4 fails to include these characteristics of the spring which is an essential element of the Reiner disclosure. The foregoing is a finding.

d) *Function of the spring.*

The defendant urges that the plaintiff improperly seeks to ascribe to the spring a dual function (a) to force the jaws to a closed position, and (b) tending to urge the arms into engagement at the hinge.

Reference is made to the statement contained in the plaintiff's main brief, at page 5, reading as follows:

"The jaws of the two-member clamp open and close while rocking upon each other in the spur and socket area (as opposed to pivoting on upstanding ears and upwardly or outwardly extending trunnions) under the influence of a spring integral with one member that tends to force the jaws to a closed position while at

the same time tending to urge the two members into engagement at their point of rocking contact (as opposed to tending to force the members apart)."

This argument overlooks the necessary meaning of the words in Claim 1 (Col. 3, lines 56 et seq.):

"One of said plates having a resilient integral extension struck from its material and projecting toward the clamping jaws, engaging the other plate and constantly urging the jaws toward their closed position."

The foregoing is consistent with the following specification (Col. 2, line 51):

"In addition to this, we provide resilient means for normally maintaining the two members 1 and 2 in engagement with each other so as to prevent the spurs 10 from becoming dislodged from the sockets or openings 11 and * * *."

This means that the quoted language from Claim 1 reflects the purpose stated in the specification that the spring is intended to hold the spurs in the sockets, thereby preventing a separation of the two arms at this point of engagement.

It is now required to ascertain whether this language indicates that the spring in the plaintiff's device is called upon to perform a duty or function in addition to that of any spring known to the art.

Among the patents cited by the defendant to establish that it was not new to teach a holding function of the spring is Jones #2,133,145 (1938) which seems to indicate clearly the dual function now under discussion. That patent is for a hair clip consisting of two arms, the upper rocking upon the lower, and the hinge element being encompassed by a spring 22, as referred to in the following language of the specification:

"* * * the spring element 22 is then inserted through the holes 13, of both members with the ends 23, of the element bearing against the outer faces of members 10 and 11 as shown in Figure 4 and thereby yieldingly holding the main or hair curl clasping portions in firm relation with each other."

The concluding sentence of Claim 3 of this Jones patent says:

"* * * and a split spring ring disposed through said holes and its ends arranged on the opposite side of said dished portions and in said sockets to afford bearing relation with the outer faces of both strips."

Whether the claim as quoted should be interpreted as asserting the holding function, may be open to dispute but the purpose stated in the specification is clear, and it is thought that the above-quoted language of the claim embodies that purpose.

Jones #2,200,624 (1940) is also for a hair clip or curler containing a spring as an alternative to a rubber band. Where the spring is used, the specification reads:

"* * * Spring 13 is centrally disposed in a longitudinal position as it encompasses the bearing portion of the clamping arms while it extends through openings 15 and 16 in the hand grip portions 3 and 4 and reaches out substantially forward on the hair clip fingers 7 and 8 anchoring the free ends 17 and 18 thereof against these fingers as it thus serves the double purpose of firmly holding the bearings together upon floating rivet 9 and at the same time, tending to hold the grip fingers 7 and 8 together."

Claims 2 and 3 deal with this form of construction, and in describing the resilient clamping member, Claim 2 reads in part:

"* * * a resilient clamping member about said curler arms and exerting an inward pressure against each of said arms holding them pivotally in place about said floating rivet and exerting said resilient inward pressure likewise against said

curler fingers on one side of said floating rivet in a manner substantially clamping them together approximately throughout their contacting ends * * *."

Claim 3 contains similar language.

Thus it is apparent that this function of the Reiner patent was known to the art. In other words, it was anticipated.

It is also necessary to consider whether the bow spring as taught and practiced by Reiner, constitutes a definite step forward in the mechanical construction of the plaintiff's device.

The Jones patent last above referred to contains a bow spring (Fig. 6) which completely encircles the hinge element, the ends of which bear upon the upper and lower arms of the clip.

Cahn #769,336 contains a spring formed from the lower arm but between the hinge and the ends of the arm, which constitute a jaw for grasping the material to be held in place, which spring is in the form of an arc that passes around the hinge element and engages the underside of the upper arm. It is thought that the extent of the arc which is formed in the spring to invoke its resilient properties, namely, the number of degrees of the arc, so constituted, does not introduce a new principle into the office or function of the spring.

In this connection it may be proper to observe that one distinction between the Reiner structure and the Cahn structure which is asserted by the plaintiff, is that since the Cahn spring urges the arms apart while the Reiner spring tends to hold them together, the former is not a proper citation against the latter. Seemingly that was the view of the Patent Office when the Reiner patent was before it.

I find it difficult to follow this reasoning. The Cahn spring arises, as has been stated, in the lower arm at a point forward of the hinge and continues around the latter and rises toward and bears upon the under surface of the upper arm at a point between the hinge

and its handle end. The thrust of that spring keeps the jaws in engagement, and in order to effect the opening thereof, the upper arm presses down against the spring, thereby overcoming its upward thrust; it is true that the hinge of the Cahn spring is constituted differently from that of Reiner, as has been heretofore explained.

It is the view of this court that ears, spurs, sockets, etc. are mere matters of mechanical adjustment and the substitution of one for the other does not involve patentable invention.

It is also believed that enough has been said about the Reiner spring and its function and the other elements of the Reiner device, to present for decision the question of how the plaintiff's clip is to be classified as to its patentable disclosure, within the test laid down by the Supreme Court in the case of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 129, 95 L.Ed. 162, in light of the following statements in that opinion:

"While this Court has sustained combination patents, it never has ventured to give a precise and comprehensive definition of the test to be applied in such cases. The voluminous literature which the subject has excited discloses no such test. It is agreed that the key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention. In course of time the profession came to employ the term 'combination' to imply its presence and the term 'aggregation' to signify its absence, thus making antonyms in legal art of words which in ordinary speech are more nearly synonyms. * * *"

After citing cases, the opinion continues:

" * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum

of its parts is the accumulation of old devices patentable. * * *.

"Neither court below has made any finding that old elements which made up this device (the one before the court) perform any additional or different function in the combination then they perform out of it. * * *

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. * * * A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known in the field of its monopoly and dimiishes the resources available to skillful men. * * * "

The application of the foregoing test to the device covered by the Reiner patent, results as follows:

(a) The elements consisting of the arms, and a means to enable one to co-act with or against the other, as exemplified in this patent, embody no new quality or function; in other words, those elements were old.

(b) A spring which is an integral part of one of those arms, the office of which is to hold the arms in operable engagement and to force the jaws of the clip to a closed position, was not new, that is, it was not taught for the first time by Reiner.

(c) The old elements heretofore discussed, which are assembled in the plaintiff's clip, do not change their functions when acting in unison, that is to say, they do not so embody a concept which is new or fundamentally different from that which characterizes earlier hair clips.

The foregoing is not stated in disregard of the argument contained in the plaintiff's main brief, which sets forth a quotation from text on the subject of a machine, from which the following is taken:

" * * * It is an artificial organism, governed by a permanent artificial rule of action, receiving crude mechanical force from the motive power, and multiplying, or transforming, or transmitting it, according to the mode established by that rule. This rule of action, imposed by the inventor on the material substances of which the machine consists, is what the courts have called the 'principle of the machine;' a phrase synonymous with 'modus operandi' and 'structural law'. * *"

The plaintiff relies on the "structural law" of the Reiner patent, and argues that it is the creation of Reiner's particular structural law which constitutes his inventive contribution to the art.

If this court could see that Reiner has done anything essentially new in bringing together the mechanical elements of his hair clip, the plaintiff's advocacy would be deemed persuasive, but such is not the case.

To repeat, the argument has not been overlooked that the spring of the Cahn patent and also that of Fuscaldo, Bergen and Turnor are essentially different from the Reiner spring because those springs tend to force the clamping members apart, which tendency is arrested only by the devices herein called for simplicity, the hinge, while the Reiner spring operates differently.

It is true that in Cahn, for instance, the spring pushes the handle of the upper member up, and therefore the clasping jaw down; this is said to mean that the Cahn device "tends to force the two members apart rather than to hold them in engagement, thus making necessary the positive locking action of the lugs of Cahn with their aperture ears."

It is also true that without the hinge element of Cahn, his clip would not function, which is the case in Reiner. The mere direction of the spring force does not patentably distinguish the two devices, in the opinion of this court.

Whether the thrust of the spring is upward or downward as in Plaintiff's

Exhibit 21, or hooked as in the preferred form described in the patent, its office is the same.

To refer to the structural law of the Reiner patent begs the question of patentability as defined in the opinion above quoted.

■ It results from the foregoing that the Reiner Reissue Patent in suit is invalid, as not disclosing patentable invention over what was known to the prior art, namely it discloses at most an aggregation of elements well known to the art, not a combination of old elements which operating together, reveal an inventive concept not theretofore disclosed.

The defendant attacks the reissue patent upon the theory that the Patent Office was hoodwinked into granting it, and perhaps the subject is of sufficient importance to require comment.

If understood, the defendant's argument involves the following:

1. The oath was insufficient.

This ignores the amended oath received in the Patent Office on August 12, 1949.

2. That the Lindsay patent #2,031,-337 and Fuscaldo #2,149,214 were not embodied in the amended oath.

The argument would be more persuasive if it were fortified by any reasoning to demonstrate that probably the application for reissue would not have been granted if those two patents in addition to the seven listed, had been specifically called to the attention of the Examiner. The entire application is so analytical in form, setting forth as it does the language of the claims in the original application and their counterparts in amended form in the application for reissue, that it is difficult to conclude either that mention of the two said patents was suppressed, or that the Office was misled by the form in which the solicitation was presented.

3. That Reiner should have stated that he derived his invention from the Leon rubber banded clip heretofore discussed.

Nothing has been shown to indicate that it was the Leon device which was incorporated in the Reiner structure, and it is not understood by this court that Reiner lay under any obligation to inform the Commissioner of Patents just what it was that kindled his inventive impulse.

4. That he did not inform the Commissioner that he had discovered additional prior art as the result of litigation between Reiner and Solo, which it has been the tedious and repetitious effort of defendant to insinuate into this record.

It is not the present opinion that he was required to do so.

5. That Reiner did not advise the Commissioner that the Solo patentee would have the right to assert intervening rights, should it so choose.

The argument would be more convincing if it were made to appear that Reiner was guilty of suppression of relevant information or of bad faith, in that connection.

This record is devoid of substance to support such a contention.

■ It is found that the Reiner Reissue Patent is not void for fraud, misrepresentation or other malpractice on the part of the patentee.

It is also urged that the claims of the reissue patent extend some of the claims as defined in the original application.

It is thought that this subject has been already discussed at sufficient length to show that in the opinion of this court the reissue claims in suit are not broader in scope than the corresponding original claims as shown in the original patent. Whatever difference there may be in form is not a difference in substance, as the subject is understood by this court. An appropriate quotation may be indulged from the opinion in the case of Monogram Mfg. Co. v. Glemby Co., 2 Cir., 136 F.2d 961, at page 964:

"A bona fide mistake in filing has been held sufficient to justify a re-issue even with slightly broadened claims. Miller v. Brass Co., 104 U.S. 350, 26 L.Ed. 783; Topliff v. Topliff, supra [145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658]."

█ It is found that the Reissue Claims do not illegally broaden the claims as stated in the original patent.

Obviously a reviewing court may find the foregoing to be clearly erroneous, and in that event it is incumbent upon this court to discuss the next subject, namely

### Infringement.

This question turns upon whether the defendant's spring which is integral with the lower clamping member and extends forward through an opening in the handle of the upper member and rests upon a portion of that member, is within the teaching of the plaintiff's patent.

It has already been stated that the claims in suit are broad enough to cover a spring integral with either member and otherwise performing the functions peculiar to it. In view of the preferred embodiment of the plaintiff's patent in which the spring is integral with the upper member having its engagement at the end in a hook as has been explained, the defendant argues that the plaintiff's structure is necessarily confined to a spring, the engagement of which is accomplished by the hook, and does not cover a spring which merely rests upon a portion of the upper member to accomplish its purpose.

█ In the belief that the claims of the plaintiff's patent as distinguished from the preferred embodiment, are properly adaptable to Plaintiff's Exhibit 21, for instance, I am of the opinion that the accused structure is an infringing device of the plaintiff's patent, and would so find if the plaintiff's patent were valid.

This conclusion is not avoided by the defendant's argument that it was new to teach the passing of the spring through an opening in one arm: See Westby #2,-417,335. The teaching of that patent refutes the defendant's argument on this subject.

The defendant also contends that since its product in the present commercial form, is made in accordance with the Schildt patents, it follows as a matter of law that there can be no infringement, since they were issued later than Reiner, and thus the Commissioner of Patents has in effect held that the Schildt structure does not infringe Reiner.

To this court it seems that the argument is fallacious, and that the following passage in the opinion of Herman v. Youngstown Car Mfg. Co., 6 Cir., 191 F. 579, at page 585, is applicable:

"Another reason sometimes advanced for supposing that the structure of the second does not infringe the claim of the first patent is that the Patent Office has declared that a patentable difference exists. The premise is sound, but not the conclusion. In examining the second application, the Patent Office has no concern with the scope of the claim of the first, and does not and must not pay any attention thereto. It is concerned only with the early disclosure by the specification and drawings. Patentable difference does not of itself tend to negative infringement. It may just as well be based upon infringement, plus improvement; and improvement may lie in addition, simplification, or variance."

█ Therefore the grant of the Schildt patents does not establish that the accused devices as manufactured by the defendant, do not infringe the patent in suit, and it is so found.

The attempt to distinguish the dihedral angle of the plaintiff's device from the similar defendant's structure which is said to be rounded and not angular, is illusory. If there is any difference in the fulcrum of the two devices, it is not visible to the naked eye, which means that the fulcrum element of the defendant's structure is not to be distinguished from the same element in Reiner.

### Counterclaims.

The first counterclaim is that the plaintiff has maliciously injured the defendant's business. Testimony in this behalf

was taken and it is less than convincing, both in presentation and argument. It is dismissed for failure of proof.

The second counterclaim is that the plaintiff's company unlawfully monopolized trade and commerce in a two-piece clip. Again the testimony and argument have been considered, and the conclusion reached is that the second counterclaim also is dismissed for failure of proof.

No occasion is seen for awarding counsel fees to the defendant, but if it is desired that this subject be presented separately, the right is reserved to the defendant to submit in a memorandum not to exceed three pages in length, whatever he may wish the court to consider in that behalf, first serving a copy upon the plaintiff's attorneys.

Settle decree, declaring the Reiner Reissue Patent in suit to be void for failure to disclose patentable invention over the prior art, with costs.